# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  v.                                    **Case No. 13-CR-220**

**DAVID LINDBERG**
        **Defendant.**

## DECISION AND ORDER

The government charged defendant David Lindberg, a former IRS special agent, with creating false documents, contrary to 18 U.S.C. § 1001(a)(3). Defendant moved to suppress those statements, arguing that he was compelled to produce them as part of his employment.[1] The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, then issued a recommendation that the motion be denied. Defendant objects, requiring me to review the matter de novo. Fed. R. Crim. P. 59(b).

## I. FACTS

Neither side specifically objects to the magistrate judge's recitation of the facts or requests a de novo hearing. I therefore adopt the magistrate judge's statement of facts (R. 36 at 3-8) and present an abbreviated version of events herein.

---

[1] In his motion, defendant moved to suppress all statements he made to his employer (the IRS) from on or about February 18, 2009, to the present. However, in their submissions the parties specifically discuss just two statements: an accident report defendant prepared on or about February 24, 2009, and six memoranda of witness interviews he submitted on March 26, 2009. The government has agreed not to use the former statement in its case-in-chief. I therefore focus on the March 26 memoranda, which form the basis for the false statement charges in the indictment.

On February 18, 2009, defendant was involved in a car accident with his government-owned vehicle. He reported the accident to his supervisor, Brandon Bielke, two days later. Bielke looked into the accident, discovering that defendant had been arrested and issued a citation for drunk driving. Pursuant to policy, Bielke notified the Treasury Inspector General for Tax Administration ("TIGTA"), and TIGTA special agent Jeffrey Majinski started an investigation. Bielke cooperated in the investigation, providing information, but Majinski did not ask Bielke to question defendant or obtain records directly from defendant.

In the meantime, Bielke continued to supervise defendant's daily activities, which included reassignment of defendant's cases after IRS management placed defendant on temporary restricted duty pending the TIGTA investigation. In looking at the previous supervisor's notes on one of defendant's cases (the "G.J. matter"), Bielke noticed that it appeared several third-party interviews had been done, but the file contained no memoranda. Bielke also checked the IRS back-up server, finding no memoranda of the interviews. On March 24, 2009, Bielke asked defendant if he had memoranda of those interviews; defendant said he did not.[2] Nevertheless, on March 26, 2009, defendant emailed Bielke six memoranda of witness interviews in the G.J. case. Bielke found this suspicious, so he reported it to Majinski, who determined that the memoranda were false. These six memoranda correspond to the six counts of the indictment, each of which alleges that defendant made a false statement by claiming to have interviewed a named witness, when in fact the interviews never happened.

---

[2]Bielke did not specifically recall whether he checked the server before or after he asked defendant for the memoranda. (Tr. at 51.)

2

## II.  DISCUSSION

**A.    Applicable Legal Standards**

Under the Fifth Amendment, the government may not compel a person to make a statement that might be used as evidence that he committed a crime. Atwell v. Lisle Park Dist., 286 F.3d 987, 990 (7th Cir. 2002). In its role as an employer, the Fifth Amendment prohibits the government from requiring an employee to incriminate himself on pain of job loss. See id. This protection originates in a series of Supreme Court cases from 1967 and 1968.

In Garrity v. State of New Jersey, 385 U.S. 493, 494 (1967), police officers questioned pursuant to a probe into the alleged fixing of traffic tickets were told that anything they said might be used against them in a state criminal proceeding, that they had the privilege to refuse to answer if the disclosure would tend to incriminate them, but that if they refused to answer they would be subject to removal from office. The officers answered, and their responses were used against them in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws. Id. at 495. The Supreme Court found the choice imposed on the officers – between self-incrimination and job loss – a form of compulsion violative of the Fifth Amendment. Id. at 496-97. The Court accordingly ruled that the Constitution "prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office." Id. at 500.

In Gardner v. Broderick, 392 U.S. 273, 278 (1968), the Court explained that while public employees may be required to answer questions directly related to the performance of their official duties, they may not be terminated for refusing to waive the immunity afforded by Garrity. Nor may they be terminated for refusing to answer after being told that their responses

3

could be used against them in subsequent proceedings. Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation, 392 U.S. 280, 283 (1968).

Taken together, these cases stand for the proposition that while the government "has every right to investigate allegations of misconduct, including criminal misconduct by its employees, and even to force them to answer questions pertinent to the investigation, . . . if it does that it must give them immunity from criminal prosecution on the basis of their answers." Atwell, 286 F.3d at 990. Further, in the Seventh Circuit, a "government employer who wants to ask an employee potentially incriminating questions must first warn him that because of the immunity to which the cases entitle him, he may not refuse to answer the questions on the ground that the answers may incriminate him." Id. (citing Confederation of Police v. Conlisk, 489 F.2d 891, 894 (7th Cir. 1973)). Atwell characterized this warning as "an anti-mousetrapping" device, without which an unrepresented person may "instinctively 'take the Fifth' and by doing so unknowingly set themselves up to be fired without recourse." Id.[3]

Another line of authority comes into play if the employee, rather than remaining silent or incriminating himself, gives false information. In United States v. Devitt, 499 F.2d 135, 142 (7th Cir. 1974), the Seventh Circuit concluded that the Supreme Court's public employee cases did not afford a third option of lying. The court accordingly held that Garrity and its progeny did not proscribe the use in a subsequent criminal prosecution of an employee's allegedly perjurious statements:

> Garrity provides the witness with adequate protection against the government's use, in subsequent criminal proceedings, of information obtained as a result of his testimony, where his refusal to testify would form the basis for disciplinary

---

[3]Not all circuits require explicit notice of the Garrity rule. See Sher v. U.S. Dept. of Veterans Affairs, 488 F.3d 489, 503-04 (1st Cir. 2007) (discussing cases).

4

action against him.  Gardner and Sanitation Men provide the witness with a shield against such disciplinary action based upon his refusal to testify, in cases in which he refuses to do so, believing that his testimony or the fruits thereof can be used against him in subsequent criminal proceedings.

Together, these decisions provide adequate protection of the witness's Fifth Amendment rights.  We find no reason or justification for extending this umbrella of protection to shield a witness against prosecution for knowingly giving false testimony.

Id.  Other circuits have followed this approach.  See, e.g., United States v. Veal, 153 F.3d 1233, 1242 (11th Cir. 1998) (collecting cases hold that the Fifth Amendment and Garrity provide no insulation against a subsequent perjury or obstruction of justice charge if a witness makes false statements).  As the Veal court explained:

Although an accused may not be forced to choose between incriminating himself and losing his job under Garrity, neither Garrity nor the Fifth Amendment prohibits prosecution and punishment for false statements or other crimes committed while making Garrity-protected statements.  Giving a false statement is an independent criminal act that occurs when the individual makes the false statement; it is separate from the events to which the statement relates, the matter being investigated.  We agree with the circuits that have addressed this issue before us and have determined that Garrity-insulated statements regarding past events under investigation must be truthful to avoid future prosecution for such crimes as perjury and obstruction of justice.  Garrity protection is not a license to lie or to commit perjury.

Id. at 1243 (internal citations omitted).

**B.    Analysis**

**1.    Defendant's Objection**

In his objection, defendant concedes that Garrity immunity does not extend to false statements.  However, he argues that he asserts a Fifth Amendment voluntariness challenge, and that for voluntariness purposes the truth or falsity of the statement does not matter.  He cites Oddsen v. Bd. of Fire and Police Comm'rs for City of Milwaukee, 108 Wis. 2d 143, 165

(1982), for the proposition that statements made absent the warnings required by Conlisk are coercive and involuntary as a matter of law.

As the magistrate judge recognized, however, defendant did not face the Hobson's choice that concerned the Conlisk and Oddsen courts. In other words, defendant was not required to provide the six memoranda or lose his job. Defendant contends that any reasonable law enforcement officer in his position would have believed that failure to provide the witness interviews would have resulted in adverse job consequences, but the testimony simply does not support that contention.

First, Bielke made no demand for the memoranda. (Tr. at 23: "I had asked Agent Lindberg if he had any of the memorandums of interview relative to these third-parties, and which he responded that he did not have them.")[4] Bielke did not pressure defendant, threaten him with termination, or tell him he could be found insubordinate if he failed to provide the memos. (Tr. at 29, 54.) On cross-examination, defense counsel asked Bielke if he had a follow-up conversation with defendant in which he said "in substance Agent Lindberg, you need to give me – you need to get me those witness interview memoranda?" (Tr. at 52.) Bielke responded: "No, not after he would have told me he did not have them." (Tr. at 53.)

Second, Bielke testified that defendant's inability to produce the memos was not a big concern. (Tr. at 23: "It's not crucial, it's not critical, it's not a problem to me at all because these people can be – easily be re-interviewed. You know, documents – re-document the income, and that type thing."; Tr. at 25: "[C]ertainly it bothered me as a supervisor that, you know, these

---

[4]After defendant said he did not have the interview memoranda, Bielke "asked" defendant to provide a summary spreadsheet of who had been interviewed. (Tr. at 53, 57.) Again, this was in the form of a request, not a demand, and Bielke made no reference to job consequences for failure to comply.

6

previous – it was documented that third-party interviews were conducted. But it was something that we can overcome with the investigation."; Tr. at 52: "I didn't have a response [to defendant's statement that he did not have the memos] at all. It was okay. You know, this is overcome-able in the investigation. I – you know, I didn't say anything further to him at all about it.") This supports the finding that defendant's job did not depend on his coming up with the memos after the initial request.

Defendant notes that on February 24, 2009, Bielke required him to provide a statement about the car accident by the end of the day; Bielke testified that failure to comply with this directive could have resulted in disciplinary action.[5] (Tr. at 34.) As indicated, Bielke took an entirely different approach regarding the interview memoranda, which also supports the finding that their provision was not compelled.

Defendant points out that the TIGTA investigation expanded from the car accident to his time and attendance records, and Bielke cooperated in that investigation by sharing information. However, the record clearly shows that Bielke requested the six memoranda pursuant to his reassignment of defendant's cases, not as part of the TIGTA probe. (Tr. at 20-23.) It was only after he reviewed the memos that he realized they could be evidence of further misconduct.

Defendant quotes the following exchange with Majinski in support of his claim that production was required:

Q. What is your understanding of the job consequences – potential job consequences to an I.R.S. employee who refuses to comply with a request by his

---

[5]Bielke acknowledged that he did not advise defendant of his Garrity rights prior to making this demand. As indicated in note 1, supra, the government has agreed not to use this statement in its case-in-chief. I therefore need not determine whether it should be suppressed.

7

> direct supervisor to provide information?
>
> A. My understanding, that there's any range of disciplinary actions that could be taken, which could include removal.

(Tr. at 80.) Majinski's general statement about the consequences of insubordination cannot overcome Bielke's specific testimony that he did not demand the six memoranda or threaten defendant with any job consequences for failure to provide them. Defendant argues that Bielke <u>did</u> require the memos, quoting the following exchange:

> Q. I mean, maybe I'm not understanding what you're telling us. Did you or did you not tell Agent Lindberg prior to March 26th, of 2009, that he had to provide you with any written witness interview memoranda that he had on the J.G. (sic) matter?
>
> A. Yes.

(Tr. at 53.) The question was ambiguous, and Bielke's affirmative response does not overcome his previous testimony that he requested but did not demand the memos, and that he intimated no job consequences for failing to produce them.

Finally, defendant argues that Bielke concealed the scope of the TIGTA investigation and his role in it. He further argues that the IRS misled him about how the memos would actually be used – for criminal investigation and prosecution. He contends that, given the nature of the investigation, Bielke should have provided notice of <u>Garrity</u> rights. He concludes that had he been told the truth about the investigation and properly advised of his <u>Garrity</u> rights, then any subsequent choice to provide the memos would have been voluntary; if, at that point, he had chosen to provide false information then <u>Devitt</u> would apply and the false statements would not be protected by <u>Garrity</u>.

While the record shows that Bielke cooperated in the TIGTA investigation, there is no evidence that he solicited the memos as part of that probe. His testimony was clear that he

8

asked for the memos in the course of reassigning defendant's cases. (Tr. at 27.) Majinski did not ask Bielke to get them (Tr. at 29, 67); indeed, Majinski didn't know anything about the memos until Bielke forwarded them (Tr. at 69), as he was required to do when confronted with evidence of possible misconduct by an IRS employee (Tr. at 57). That Bielke may have assumed, in the course of cooperating with the investigation, that the TIGTA probe extended to time and attendance issues (Tr. at 42) does not mean that everything he did as a supervisor constituted a component of the investigation.

Ultimately, defendant's claim that the memos must be suppressed due to the absence of Garrity warnings assumes that Bielke was required to provide such warnings before asking for the memos, and that defendant provided the memos in response to Bielke's demand. The record shows that Bielke asked for the memos as part of his general supervisory duties; this was not a potentially incriminating question made as part of an investigation into an allegation of employee misconduct, which could trigger the requirement of a warning under Seventh Circuit law. See Atwell, 286 F.3d at 990. More importantly, the record shows that defendant provided the memos voluntarily. After defendant told Bielke he did not have the memos, Bielke did not ask defendant to (re)create them; defendant did that entirely on his own. See Miranda v. Arizona, 384 U.S. 436, 478 (1966) ("Volunteered statements of any kind are not barred by the Fifth Amendment."). Accordingly, defendant's argument for suppression fails.

### 2. Government's Response

As indicated, defendant's argument rests on the assumption that an un-warned, compelled statement must be suppressed, regardless of its veracity. As the government notes in its response, however, there is authority for the proposition that false statements are always unprotected, regardless of whether the speaker was provided with a proper warning. See

9

United States v. Wong, 431 U.S. 174 (1977) (declining to suppress false grand jury testimony on the ground that no effective warning of the Fifth Amendment privilege to remain silent was given); see also United States v. Knox, 396 U.S. 77 (1969) (rejecting the argument that false statements on a tax return were involuntarily under the Fifth Amendment because returns are compelled under the tax laws). The government argues that, under these cases, even if defendant was entitled to Garrity warnings, by providing false information he "took 'a course that the Fifth Amendment gave him no privilege to take.'" Wong, 431 U.S. at 179 (quoting Knox, 396 U.S. at 82).

In reply, defendant attempts to distinguish Wong, noting that it is unsettled whether Miranda-type warnings are required for grand jury witnesses, see United States v. Gillespie, 974 F.2d 796, 802 (7th Cir. 1992), while police officers have a clear right under Garrity. However, this overlooks the fact that in Devitt the Seventh Circuit rejected the police officer-defendant's Garrity claim, despite the fact that he spoke without a proper warning.[6] The court said:

> We believe defendant's reliance upon the aforementioned decisions is misplaced. Had defendant admitted [criminal conduct], neither his testimony nor the fruits thereof could have been used against him in a subsequent prosecution. Garrity v. New Jersey, supra. Had he exercised his Fifth Amendment privilege, he could have attacked the legality of any subsequent disciplinary action against him on the basis of Gardner and Sanitation Men. But we find nothing in these decisions or in this court's holding in [Conlisk] which grants a witness before the grand jury the third alternative which, in substance, is proposed by the defendant in the instant case: the right under such circumstances to knowingly make a false material declaration while testifying under oath before a grand jury.

Devitt, 499 F.2d at 142. Thus, under Devitt, the mere failure to warn will not clothe a false

---

[6]Specifically, he provided false testimony while subject to the same police department rule struck down in Conlisk. 499 F.2d at 141-42.

10

statement with Garrity protection.

Defendant further contends in reply that unlike the defendant in Wong he was misled as to the nature of the investigation and faced the loss of his job if he refused to respond. The record does not support these contentions. Bielke was not trying to trick or trap defendant by asking for the memos; he was simply trying to get the case together for reassignment to a new agent. (Tr. at 27.) He had no reason to know or believe that defendant would respond to the request by (allegedly) fabricating the interview memoranda. And, aside from Agent Majinski's general statement about the consequences of insubordination, quoted above, defendant cites no evidence that he faced termination if he failed to produce the memos.

## III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 36) is adopted, and defendant's motion to suppress (R. 15) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 1st day of August, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge